**HABITAT EDUCATION CENTER, INC., David Zaber and Ricardo Jomarron, Plaintiffs,**

v.

**Dale BOSWORTH, as Chief of the U.S. Forest Service, Mike Johanns, as Secretary of the United States Department of Agriculture, Matt Hogan, as Acting Director of the United States Fish and Wildlife Service, and Gale Norton, as Secretary of the Interior, Defendants.**

No. 03–C–1023.

United States District Court, E.D. Wisconsin.

April 1, 2005.

Howard Learner, Sean O'Bosak, Brady Williamson, Shannon Fisk, for Plaintiffs.

Benjamin Longstreth, David Oberstar, for Defendants.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Habitat Education Center, Inc., a citizen's organization engaged in forest, wildlife, and natural resource protection, and two of its officers, bring this action against defendants, Dale Bosworth, Chief of the United States Forest Service, Mike Johanns, Secretary of the United States Department of Agriculture (collectively the "Forest Service"), Matt Hogan, Acting Director of the United States Fish and Wildlife Service, and Gale Norton, Secretary of the Interior (collectively the "FWS").[1] Plaintiffs allege that in approving logging activities and timber sales in the Northwest Howell area of the Chequamegon–Nicolet National Forest ("CNNF") in northern Wisconsin, the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1687 and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544.

Plaintiffs allege that in approving the Northwest Howell project the Forest Service violated NEPA by: (1) failing to consider the cumulative impacts on the environment of past, present and reasonably foreseeable future logging projects, and (2) failing to consider sound, high quality scientific information indicating that the project will harm several species inhabiting the CNNF which are already in decline. Plaintiffs allege that the Forest Service violated NFMA by: (1) approving the project based on an outdated 1986 forest plan, and (2) failing to collect data indicating the effect of the project on management indicator species. Finally, plaintiffs allege that the Forest Service's determination that the project will not affect Canada lynx violated ESA and that the Forest Service

and the FWS violated ESA by failing to consult about Canada lynx.

Plaintiffs bring the action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which permits persons who are adversely affected by the action of a federal agency to obtain judicial review of such action. *See Sierra Club v. Marita*, 46 F.3d 606, 610 n. 3 (7th Cir.1995). Plaintiffs have standing to sue because they allege that their use and enjoyment of the CNNF will be diminished by the actions complained of. *See Rhodes v. Johnson*, 153 F.3d 785, 787 (7th Cir.1998). Before me now are the parties' cross-motions for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The CNNF comprises two areas, the Chequamegon, which covers 858,400 acres in northwestern and north-central Wisconsin and the Nicolet, which covers 661,400 acres in northeastern Wisconsin. Previous to 1993, the Forest Service managed the areas separately but has since has treated them as a single unit. In 2001, the Forest Service commenced the process of preparing an environmental impact statement ("EIS") concerning the Northwest Howell project on the Nicolet side of the CNNF. On April 14, 2003, the District Ranger signed a record of decision ("ROD") for the project and released the final EIS. The District Ranger selected the second of four alternative approaches because it "best addresses" the "most important component of the purpose and need for this project[, which] is increasing structural and species diversity in the hardwood stands." (R. 1066.) Plaintiffs administratively appealed unsuccessfully, and the parties' attempt to resolve the dispute informally also failed.

---

1. Defendant Johanns recently succeeded Ann Veneman as Agriculture Secretary, and defendant Hogan recently succeeded Steven Williams as Director of the Fish and Wildlife Service. I have amended the caption to reflect these changes.

In 2003, the Forest Service also approved five other timber sales in the CNNF, four to occur on the Chequamegon side, the Cayuga, Gilman Tornado, Hoffman Sailor and Sunken Moose sales, and one, the McCaslin sale, to occur on the Nicolet side. On April 30, 2004, the Forest Service released the 2004 forest plan for the CNNF, and it became effective in June 2004.

Additional facts will be stated in the course of the decision.

## II. STANDARDS OF REVIEW

As stated, the parties bring cross-motions for summary judgment under Fed. R.Civ.P. 56. However, in cases like the present one where a district court reviews the decision of an agency, a summary judgment motion is an imperfect vehicle. "This is so because when a district court reviews an agency decision, it performs an essentially appellate function." *See Primeco Pers. Communications, Ltd. P'ship v. City of Mequon*, 242 F.Supp.2d 567, 574 (E.D.Wis.2003) (noting that, in cases involving review of municipal decisions under the Telecommunications Act, "district courts sit in an appellate capacity, much as in Social Security cases where they review the decisions of administrative law judges"); *see also Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1501 (10th Cir.1992) (Kane, J., concurring) (pointing out that summary judgment motions in social security cases are unnecessary for the reasons that I have stated); *Vaile v. Chater*, 916 F.Supp. 821, 823 n. 2 (N.D.Ill.1996) (in a Social Security case, treating the Commissioner's motion for summary judgment as a motion to confirm the ALJ's decision). The purpose of a

summary judgment motion is to determine whether a case should proceed to trial, but in a case where a court reviews an agency decision, the "trial," so to speak, has already taken place. Further, in the present case, the standard of review is not whether there is a genuine issue of material fact, as it is under Rule 56, but, rather, whether the agency's decision is "arbitrary and capricious" under the APA. *See, e.g., Env't Now! v. Espy*, 877 F.Supp. 1397, 1421 (E.D.Cal.1994) (noting that when the court reviews an agency decision "[t]he question is not whether there is a genuine issue of material fact, but whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole"). The Federal Rules appear not to provide an appropriate vehicle for challenging an agency's decision. I believe, however, that it is sufficient for a party to make a simple motion stating the relief requested. Therefore, I will treat plaintiffs' motion as one to reverse the agencies' determinations and the agencies' cross-motion as one to affirm such determinations.

I review challenges to agency action under NEPA, NFMA, and ESA[2] under the standard provided in the APA. *See Highway J Citizens Group v. Mineta*, 349 F.3d 938, 952 (7th Cir.2003) (reviewing NEPA claim); *see also Ind. Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 859, 862 (7th Cir.2003) (reviewing NFMA claim); *Ctr. for Marine Conservation v. Brown*, 917 F.Supp. 1128, 1143 (S.D.Tex.1996) (reviewing ESA claim). Under such standard, I may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

---

**2.** ESA permits citizen suits and judicial review of agency action, but does not specify a standard of review. Thus, when reviewing agency action under ESA I look to the standard set forth in APA § 706. *See Ariz. Cattle*

*Growers' Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1235–36 (9th Cir.2001) (noting that APA § 706 governs judicial review of administrative decisions involving ESA).

with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), 706(2)(D). This standard of review is narrow and requires that I "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error ·in judgment." *Highway J. Citizens Group,* 349 F.3d at 952–53 (quoting *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)) (internal quotations omitted). I may not substitute my judgment regarding the environmental consequences of an action for that of the agency. *Id.* at 953. However, I must "insure that the agency has taken a 'hard look' at environmental consequences." *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Thus, if

> an agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]

the agency has violated the APA. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

When interpreting NEPA, I must give "substantial deference to the regulations issued by the Council on Environmental Quality" ("CEQ"). *Ctr. for Biological Diversity v. U.S. Forest Serv.,* 349 F.3d 1157, 1166 (9th Cir.2003) (citing 42 U.S.C. § 4342). "The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted 'to the fullest extent possible' in accord with the policies embodied in the Act." *Id.* (citing 42 U.S.C. § 4332(1) and *California v. Block,* 690 F.2d 753, 769 (9th Cir.1982)). "Grudging, pro forma compliance will not do." *Id.* (citation omitted).

A plaintiff challenging agency action under NEPA, NFMA, or ESA bears the burden of proof. *Marita,* 46 F.3d at 619. Finally, in reviewing agency action under the APA, I "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The scope of review is thus necessarily limited to the administrative record before the agency decisionmaker. *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

## III. NEPA CLAIMS

Congress enacted NEPA to foster better decisionmaking and informed public participation in actions that affect the environment. 42 U.S.C. § 4321 *et seq.* To achieve this goal, NEPA requires that federal agencies, such as the Forest Service, prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must include a "detailed statement" concerning "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided" and alternative proposals that could minimize the adverse impacts or enhance the quality of the environment. *Id.* Finally, the EIS must include an analysis of the "relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity" and a list of "any irreversible and irretrievable commitments of resources which would be involved in the proposed action" if it were implemented. *Id.* NEPA requires analysis and public disclosure of significant environmental effects in order to ensure informed public decisionmaking, but it does not require that agencies select any particular decision. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

## A. Cumulative Impacts Analysis

As noted above, NEPA requires agencies to prepare EISs in anticipation of significant federal actions. 42 U.S.C. § 4332(2)(C). The CEQ regulations implementing NEPA provide that an EIS shall include a discussion of environmental impacts, including impacts that are direct, indirect and cumulative. 40 C.F.R. § 1508.25. The regulations define "cumulative impact" as

> the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. Plaintiffs allege that the Forest Service failed to adequately analyze the cumulative impacts of the Northwest Howell timber sale by: (1) unreasonably choosing the geographic area in which to conduct the cumulative impacts analysis; (2) failing to evaluate the effects of the five other timber sales that it approved; and (3) failing to analyze the cumulative impacts in sufficient detail and with sufficient specificity. I address these contentions below.

### 1. Determination of Geographic Area in Which to Analyze Cumulative Impacts

■ The "identification of the geographic area" within which a project's cumulative impact on environmental resources may occur "is a task assigned to the special competency of the appropriate agencies." *Kleppe*, 427 U.S. at 414, 96 S.Ct. 2718; *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059 (9th Cir.2002) (noting that the court should defer to an agency's determination of the scope of its cumulative impact review). Nevertheless, "the choice of analysis scale must represent a reasoned decision and cannot be arbitrary." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir.2002). Thus, "[a]n agency must provide support for its choice of analysis area and must show that it considered the relevant factors." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir.2002). Relevant factors include "the scope of the project considered, the features of the land, and the types of species in the area." *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 958 (9th Cir.2003). The presence of species habitat outside the project area is also a relevant consideration in determining the geographic scope of a cumulative impacts analysis for wildlife. Council on Environmental Quality, *Considering Cumulative Effects Under the National Environmental Policy Act* 15 (January 1997), *available at* http://ceq.eh.doe.gov/nepa/ccene-pa/sec2.pdf (last viewed Mar. 31, 2005). Thus, NEPA requires that an agency explain in the EIS how it chose the geographic area in which it conducted the cumulative impacts analysis and that it demonstrate that in making such choice it considered the relevant factors.

■ In the present case, plaintiffs allege that the Forest Service improperly limited the geographic scope of the area in which it conducted the cumulative impacts analyses relating to wildlife including goshawk[3], red-shouldered hawk[4], and American mar-

---

3. The northern goshawk is an uncommon to rare bird, which is found in small numbers in forests. It is approximately twenty-one inches long and has a forty-one inch wing span. It nests in tall trees and feeds mainly on grouse, rabbits and squirrels. David Allen Sibley, *The Sibley Field Guide to Birds of Eastern North America*, 96 (2003).

4. The red-shouldered hawk is an uncommon bird found in mature lowland forests. It is about seventeen inches long and has a forty

ten.[5] However, the record does not make clear exactly what geographic area the agency chose in which to conduct the above cumulative impacts analyses. This is so because neither the EIS nor the related Biological Evaluation ("BE") clearly identifies such area. The EIS mentions past, present and reasonably foreseeable future activities only in the Northwest Howell project area, suggesting that it considered the impact of such activities only in such area. (*See, e.g.,* R. 772, 822, 841, 1097–1101.) Elsewhere, however, the EIS includes statements that refer, albeit obliquely, to a broader area, e.g., "forest-wide, existing mature hardwood or mixed hardwood/conifer continues to provide suitable habitat for both northern goshawk and red-shouldered hawk," "only small portions of the forest are disturbed (usually temporarily) each year." (R. 1101.)

Regardless of the area in which the Forest Service actually conducted the cumulative impacts analyses, it should have disclosed in the EIS how it chose such area and by failing to do so it violated the requirements of NEPA. Neither in the EIS nor the BE does the agency discuss the choice of area issue at all much less demonstrate that it made a reasoned decision and considered all of the relevant factors. It appears that the Forest Service overlooked the issue altogether. NEPA required the Forest Service to put the issue on the table so that it and the public could scrutinize alternative approaches. By not doing so, the agency impeded informed decision-making and deprived the public of an opportunity to comment on the issue and thus assist in the

decision-making process. *See Lands Council v. U.S. Forest Serv.,* 379 F.3d 738, 744 (9th Cir.2004) ("stating that NEPA requires a sufficiently detailed statement of alternatives so as to permit informed decisionmaking"); *see also DuBois v. U.S. Dep't of Agric.,* 102 F.3d 1273, 1285–86 (1st Cir.1998) (explaining that EISs promote NEPA's purposes by making information "available to the public, which may then offer its insight to assist the agency's decision-making through the comment process").

The Forest Service's failure to discuss the issue of the geographic area in which to conduct the cumulative impacts analyses is particularly significant in the present case because such failure prevented the public from knowing whether the agency considered including in the analyses the effects of the five other timber sales that it approved roughly contemporaneously with the Northwest Howell project. As previously noted, in determining the geographic scope of the area in which to conduct a cumulative impacts analysis for wildlife, an agency should consider the presence of and possible effect on species outside the project area. *Considering Cumulative Effects, supra,* at 15. It is undisputed that wildlife, such as the red-shouldered hawk, goshawk, and marten, reside in habitat scattered throughout the CNNF. Thus, the Northwest Howell project in combination with the five other projects could impact the entire population of such species residing in the CNNF. Therefore, the five other timber sales were relevant factors in identifying the geographic area in which to

---

inch wing span. It nests in tall trees, and feeds mainly on reptiles, amphibians, small mammals and birds. Sibley, *supra,* at 100.

5. The American marten is a member of the weasel family. It is approximately six inches tall and between eighteen and twenty-five inches in length. It lives in mature, dense

conifer forests or mixed conifer-hardwood forests, and is mostly carnivorous. Wisconsin Department of Natural Resources, *American Marten (Martes Americana), at* http://www. dnr. state.wi.us/org /land/er/factsheets /mammals/Marten.htm (last modified Oct. 19, 2004).

conduct the cumulative impacts analyses for wildlife.

## 2. Consideration of Other Timber Sales

▮ The requirement that the Forest Service discuss in the EIS the cumulative impacts on the environment prevents it "from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 297 (D.C.Cir. 1988) (citations omitted). Thus, in some cases, courts have held that the Forest Service must analyze the cumulative impact of contemporaneous sales or activities within a region. *See, e.g., Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1306–08 (9th Cir.2003); *Native Ecosystems Council*, 304 F.3d at 896; *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1313 (9th Cir.1990). Plaintiffs argue that the agency's cumulative impacts analyses relating to the Northwest Howell project are inadequate because they do not consider the environmental impacts of the other five timber sales on northern goshawk, red-shouldered hawk, and American marten. However, I may not properly decide this issue because doing so would require me to determine the appropriate geographic area in which the agency should conduct the analyses, a decision which must be left to the expertise of the Forest Service after consideration of all relevant factors. *See Marita*, 46 F.3d at 619 (noting that "[t]he court is not empowered to substitute its judgment for that of the agency").[6]

## 3. Sufficiency of Cumulative Impacts Analyses

▮ A cumulative impacts analysis must be sufficiently detailed to be "useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts and must rely on some quantified or detailed information." *Lands Council v. Vaught*, 198 F.Supp.2d 1211, 1245 (E.D.Wash.2002). Without quantified or detailed information, "neither the courts nor the public, in reviewing the Forest Service's decisions, can be assured that the Forest Service provided the hard look that it is required to provide." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379–80 (9th Cir.1998). "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Id.* at 1380. In the present case, plaintiffs allege that insofar as they relate to red-shouldered hawk, goshawk and marten, the cumulative impacts analyses are inadequate because they consist only of unsubstantiated generalizations and vague references.

The Forest Service responds that the amount of detail required by NEPA varies according to the amount of harm that a proposed project may cause. Thus, the Forest Service argues that, in the present case, the EIS did not have to contain a high level of detail because the Northwest Howell project will not cause severe environmental harm. *See Block*, 690 F.2d at 761 (holding that the "detail that NEPA requires in an EIS depends upon the nature and scope of the proposed action"); *Nucleus of Chi. Homeowners Ass'n v.*

---

**6.** Plaintiffs also argue that the geographic scope of the analysis area for management indicator species ("MIS") was too small. MIS serve as a "proxy for determining the effects of management activities on other species." *Utah Envtl. Cong. v. Bosworth*, 372

F.3d 1219, 1224 (10th Cir.2004); *see also infra* pp. 26–31. However, again I may not properly decide this issue because to do so would require me to decide an issue properly left to the agency after consideration of the relevant factors.

*Lynn,* 524 F.2d 225, 231 (7th Cir.1975) (noting that the "content and volume of" the record required to support a decision not to prepare an EIS "depend[s] upon the particular Federal action proposed"); *see also Coalition on Sensible Transp., Inc. v. Dole,* 826 F.2d 60, 66 (D.C.Cir.1987) (noting "[i]t is of course always possible to explore a subject more deeply and to discuss it more thoroughly. The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts").

■ However, regardless of the degree of environmental harm that a proposed action may cause, the cumulative impacts analysis must satisfy a minimum standard, i.e., it must provide sufficiently specific information to assure the court and the public that the agency took a hard look at a project's potential cumulative environmental effects. *Lands Council v. Powell,* 379 F.3d 738, 745 (9th Cir.2004) (noting that "the general rule under NEPA is that in assessing cumulative effects, the [EIS] must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment"). In other words, the EIS must "provide decisionmakers with sufficiently detailed information to aid in determining whether to proceed with the action in light of its environmental consequences and to provide the public with information and an opportunity to participate in the information gathering process." *Nothwest Res. Info. v. Nat'l Marine Fisheries Serv.,* 56 F.3d 1060, 1064 (9th Cir.1995); *see also Young v. Gen. Serv. Admin.,* 99 F.Supp.2d 59, 67 (D.D.C.2000) (holding that "[i]n addition to providing crucial information to the agency, NEPA also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision. This larger audience includes ... the public, which receives the assurance that the agency has indeed considered environmental concerns in its decisionmaking process as well as the opportunity to comment"). Thus, an agency must demonstrate in the EIS that it took the required hard look at the potential environmental consequences of a proposal and then may or may not provide additional detail as it deems appropriate.

### a. Red–Shouldered Hawk and Northern Goshawk

In connection with red-shouldered hawk and goshawk, I note first that the Regional Forester identified both species as Regional Forester Sensitive Species ("RFSS"). (R. 1097.) RFSSs are "those plant and animal species identified by a Regional Forester for which population viability is a concern, as evidenced by: (a) significant current or predicted downward trends in population numbers or density; or (b) significant current or predicted downward trends in habitat capability that would reduce a species' existing distribution." (Forest Service Manual § 2670.5(19)); (R. 1095.) Concerning red-shouldered hawk and goshawk, the cumulative effects analysis provides as follows:

Forest-wide, existing mature hardwood or mixed hardwood/conifer stands continues to provide suitable habitat for both northern goshawk and red-shouldered hawks. Over time, the forest is ever-maturing and thus more and more suitable habitat becomes available for nesting and foraging. Conversely, each year more demands are made on what could be potential woodland raptor habitat. These demands include such activities as timber harvest, road construction, road improvement, trail use or expansion etc. In light of these ac-

tivities, district records indicate that most territories remain intact, but individual nesting sites may move around somewhat. Cumulatively, no adverse impacts are anticipated because only small portions of the forest are disturbed (usually temporarily) each year. Impacts related to weather, and mammalian predators appear to impact these species more so than human related disturbance, but maintaining quality "core area" habitat is essential in providing for viable goshawk and red-shouldered hawk populations. Alternatives that disturb a lesser amount of mature hardwood forests would be more beneficial than alternatives that fragment greater amounts of this type of habitat. Alternatives that provide some regenerating forest conditions (outside of the mature hardwood forest areas) would also be most favorable since these areas will provide habitat that support prey for woodland hawks. (R. 1101, Ex. 5.)

██ The above analysis does not satisfy the requirements of NEPA because it provides too little detail to demonstrate that the Forest Service took a hard look at the cumulative effects of past, present, and reasonably foreseeable future logging projects on red-shouldered hawk and goshawk. Although the analysis acknowledges that it is essential to maintain quality habitat, it gives no indication how much goshawk and red-shouldered hawk habitat exists and does not make clear how the Northwest Howell project and other activities will affect such habitat. The analysis suggests that "more suitable habitat" will become available "over time," (R. 1101), but provides no meaningful information concerning whether such suitable habitat is needed and, if so, when it will become available and in what amount. In the absence of some quantification or at least greater detail, the EIS's statements regarding habitat are of little, if any, utility.

Additionally, although the Forest Service acknowledges that logging, road construction, road improvement, and other human activities will impact goshawk and red-shouldered hawk and their habitat, the analysis provides no specific information concerning such impacts. It gives no indication concerning the number of acres logged, the nature and scope of the "other human activities" that occurred in or proximate to red-shouldered hawk and goshawk habitat, and how past logging and human activities affected such habitat. Along the same lines, the analysis states that timber harvest, road construction and other activities will disturb "only small portions of the forest ... (usually temporarily) each year," (R. 1101), but does not define "forest" and does not specify how much forest will be impacted or for how long. In sum, the analysis is very general, so much so that it is of little or no value to an informed member of the public who is concerned about the cumulative impacts of the project and other logging and human activities on the goshawk and red-shouldered hawk. Moreover, the lack of detail and quantification are such that an objective reviewer cannot be confident that the agency took the hard look at environmental consequences that NEPA requires.

██ To justify the analysis's generality, the agency asserts that the project together with other projects, past, present or future, will not have a significant environmental impact. However, as explained above, even if the cumulative environmental impacts will not be significant, the agency must still demonstrate that it took a hard look at cumulative impacts. Here, the agency has not done so. Nor has it explained why it could not do so. *See Neighbors of Cuddy Mountain*, 137 F.3d at 1380 ("General statements about 'possible' effects and 'some risk' do not consti-

tute a 'hard look' absent a justification regarding why more definitive information could not be provided"). The agency also contends that in determining the adequacy of the cumulative impacts analysis, I should consider information relating to red-shouldered hawk and goshawk in the administrative record. (*See* R. 2396, 2408.) However, I may not do so because deficiencies in an EIS cannot be cured by documents in the administrative record. *Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1069 (1st Cir.1980). Finally, the Forest Service argues that when the cumulative impacts analysis for red-shouldered hawk and goshawk is considered in conjunction with other sections of the EIS, the analysis is sufficient. However, other sections of the EIS do not remedy the deficiencies of the cumulative impacts analysis for red-shouldered hawk and goshawk because they do not specifically discuss cumulative effects in relation to these species. (*See* R. 810–13, 830, 840–43) (describing past harvests); (*see also* R. 832, 838) (detailing the generally short habitat recovery period for selective harvest).

### b. American marten

Plaintiffs also argue that the cumulative impacts analysis relating to the American marten, also an RFSS, is insufficient. Such analysis states:

> The cumulative effects on American marten could include increasing levels of disturbance from year-round activities associated with timber harvest treatments, snowmobile trail use and forest use in general. However, marten can tolerate some level of disturbance, and have been observed on occasion living in and near campgrounds and along low use roads. Loss of denning habitat or conifer habitat resulting from past or future harvest, combined with harvest treatments may also adversely affect this species since each treatment probably reduces the numbers of potential

> den sites, but as the stands age, new habitat is created. New habitat, consisting of blown down trees, dead and dying trees, tip-up mounds etc. is also created from natural processes such as wind events and disease. Table 2 provides a summary of recent major windthrow events. Past treatments in this area did follow forest reserve tree guidelines for maintaining or providing for existing and potential den trees respectively, although denning habitat is not overly abundant in the younger hardwoods. Also, even though harvest treatments may result in the possible reduction in the abundance of den sites, new habitat is created each year through natural processes such as wind storms and other natural events (disease of trees, woodpeckers, insect outbreaks, etc.) See Table 2 above.

(R. 1098–99, Ex. 5.)

 Like the cumulative effects analysis relating to red-shouldered hawk and goshawk, the above analysis is so general that it fails to demonstrate that the Forest Service took a hard look at the potential cumulative effects on marten. The analysis indicates that logging and associated activities can harm marten but provides no quantification or detailed supporting information. For example, the EIS acknowledges the considerable logging conducted in the last twenty-four years in the project area (R. 772), and indicates that such logging may reduce "den sites," (R. 1099), but does not indicate how much or what type of logging occurred in marten habitat or what effects it had. The EIS suggests that natural processes such as wind storms will create new habitat but leaves unclear whether natural processes will create sufficient habitat to offset losses resulting from logging. Nor does the EIS indicate over what period of time such habitat will emerge. Additionally, the EIS states that

timber companies conducted past logging in accordance with guidelines designed to maintain marten habitat but provides no information about the guidelines, whether they were effective or whether the current project will be subject to them. In sum, the agency again analyzes cumulative impacts at an extremely high level of generality. It provided insufficient information to demonstrate that it took a hard look at the impacts of the project on marten. Thus, the analysis does not satisfy NEPA.

The Forest Service defends the analysis largely by reiterating the information contained in it and does not directly address the concern about generality. Further, it asserts that other sections of the EIS remedy any deficiency. However, this contention is unpersuasive because the other sections do not discuss cumulative effects relating to marten. (*See* R. 810–13, 830, 840–43) (describing past harvests); (*see also* R. 832, 838) (detailing the generally short habitat recovery period for selective harvest). Finally, as explained above, I may not consider any supplemental information concerning marten contained in the administrative record to remedy a deficiency in the EIS. *See Grazing Fields Farm*, 626 F.2d at 1069.

### B. Scientific Information

■ Agencies "shall discuss at appropriate points in the final statement any responsible opposing view ... and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b). If there is high quality information that opposes the agency's conclusions, the agency must make "a good faith reasoned response to it." *Seattle Audubon Soc'y v. Lyon*, 871 F.Supp. 1291, 1318 (W.D.Wash. 1994); *see also Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir.1993) (finding that the Forest Service was required to address in the final environmental impact statement scientific criticisms opposing evidence upon which the final

statement's management strategy rested). In making decisions, agencies must also rely on high quality information. *See* 40 C.F.R. § 1500.1(b) (requiring that environmental information be of "high quality"). In the present case, plaintiffs allege but do not establish that the Forest Service failed to satisfy these requirements.

■ Plaintiffs argue that the agency does not adequately respond to information indicating that the Northwest Howell project might threaten the viability of goshawk, red-shouldered hawk and marten. I agree with plaintiffs that the EIS could be more thorough and, as discussed, specifically conclude that the cumulative impacts analyses relating to the above species are inadequate. However, I am unpersuaded by plaintiffs' argument that the EIS does not recognize the possibility of harm to goshawk, red-shouldered hawk and marten. With respect to goshawk, plaintiffs argue that the agency does not consider data indicating that logging can substantially reduce productivity of nests of goshawk. However, the EIS acknowledges the goshawk's RFSS designation and the issue of viability but disagrees that the Northwest Howell project will contribute to the problem. Plaintiffs also contend that the Forest Service ignores studies conducted by Dr. Tom Erdman and Dr. Tom Doolittle indicating that logging can negatively affect goshawk viability. (*See* R. 4202) (noting that forty-three percent of goshawk territories in northern Wisconsin had been cut, and that "cutting is a serious problem"); (*see also* R. 4203) (noting that nests in logged areas were not reoccupied by goshawks). Again, however, the EIS acknowledges the issue of viability. Moreover, Erdman's and Doolittle's studies do not directly address the Northwest Howell project.

Plaintiffs also argue that the EIS fails to acknowledge the issue of viability as it relates to red-shouldered hawk. They point to Dr. John Jacobs's statements indicating concern about the reproduction rates of red-shouldered hawk and his recommendation of "a complete ban on all logging for the next 100 years." (R. 4056.) Once again, the agency acknowledges the red-shouldered hawk's RFSS designation and the issue of viability. Additionally, Jacobs's recommendations do not relate specifically to the Northwest Howell project. Plaintiffs also contend that the Forest Service failed to address data indicating that, in order to thrive, red-shouldered hawk require "large blocks, 1000's of acres, of mature or uneven aged northern hardwoods interspersed with minor amount of younger forest." (R. 2681.) The Northwest Howell project would eliminate one of the three habitat blocks in the area consisting of more than 1,000 acres. However, the project would only reduce the habitat block from 1,086 acres to a minimum of 950 acres. Thus, the remaining block would be close to 1,000 acres, and I cannot conclude that the agency's failure to include this information in the EIS violates NEPA.

Plaintiffs also argue that the fact that the project would occur proximate to one of only two known marten populations in the CNNF suggests that logging and road building could adversely affect the marten's viability. Once again, however, the agency recognizes the viability issue relating to marten, notes its RFSS status and points out that the record contains no concrete information that the Northwest Howell project will threaten marten viability.

Finally, plaintiffs contend that the agency relied on information that was not of high quality, i.e., the 1986 forest plan, which they assert is outdated. However, the record indicates that in addition to considering information in the 1986 plan, the agency looked at a significant quantity of more recent information. (R. 997.) Therefore, the Forest Service did not violate NEPA in this respect.

## IV. NFMA CLAIMS

▪ NFMA governs the Forest Service's regulation of the national forest system. 16 U.S.C. § 1600 *et seq.* "NFMA requires the Secretary of Agriculture to develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." *Biodiversity Assocs. v. U.S. Forest Serv.,* 226 F.Supp.2d 1270, 1278 (D.Wyo.2002); 16 U.S.C. § 1604. Each forest plan governs the use of an individual forest, and must fulfill the Forest Service's mandate to "provide for multiple use and sustained yield ... includ[ing] coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). Furthermore, "[i]n developing the plans, the Forest Service must take both environmental and commercial goals into account." *Biodiversity Assocs.,* 226 F.Supp.2d at 1278 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 729, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) (internal quotations omitted)). The final plan divides a forest into management areas and stipulates how resources in each of these areas will be administered. A forest plan must be revised when conditions in a forest "have significantly changed," but at least once every fifteen years. 16 U.S.C. § 1604(f)(5). After a forest plan is created, it is implemented through the consideration and adoption of individual forest projects. 16 U.S.C. § 1604(i). Individual, site-specific projects must be consistent with the forest plan and are also subject to further analysis under NEPA. *Id.*

## A. Reliance on 1986 Plan

 Plaintiffs claim that the Forest Service violated NFMA by analyzing the Northwest Howell project under the 1986 plan rather than the 2004 plan. They contend that new science and changed conditions caused the 1986 plan to become outdated. The agency responds that plaintiffs' claim is moot because it updated its analysis with a Supplemental Information Report ("SIR"), which found the project to be consistent with the 2004 plan.[7] However, plaintiffs deny that the claim is moot, arguing that the 2004 plan is more environmentally friendly than the 1986 plan and that the agency could not have definitively determined whether the project was truly consistent with the 2004 plan's goals,[8] objectives,[9] standards[10] and guidelines,[11] merely by updating its analysis under the 1986 plan. (*See* SIR at 1) (noting that the SIR does not discuss "goals and objectives unless they relate to a substantial change in environmental impacts that were disclosed in the Northwest Howell" EIS). Rather, they assert that

the Forest Service should have started from scratch and conducted a new analysis.

A case is moot when it no longer presents a live case or controversy. *See Bd. of Ed. of Downers Grove Grade Sch. Dist. No. 58 v. Steven L.,* 89 F.3d 464, 467 (7th Cir.1996). "Action by the defendant that simply accords all the relief demanded by the plaintiff" may render an issue moot. 13A Charles Alan Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice & Procedure,* § 3533.2, at 238 (2d ed. 1984 & Supp.2004). In other words, "[s]o long as nothing further would be ordered by the court, there is no point in proceeding to decide the merits." *Id.* As the foregoing discussion indicates, plaintiffs' claim that the Forest Service erred in approving the Northwest Howell project under the 1986 plan is not moot because the agency did not provide "all the relief demanded by plaintiff," *id.,* i.e., it did not conduct a complete analysis of the project under the 2004 plan.

7. Plaintiffs have filed a motion requesting that I disregard the Forest Service's SIR because it is not part of the administrative record. However, in determining whether an issue is moot, I may appropriately consider documents that are not part of the administrative record. *See Southern Utah Wilderness Alliance v. Smith,* 110 F.3d 724, 729 (10th Cir. 1997) (noting that while documents that are outside the administrative record may not be used in determining the substantive issues in a case, they may be used in determining the issue of mootness because "[b]y definition, mootness concerns events occurring *after* the alleged violation"). Thus, I will deny plaintiffs' motion to disregard the SIR.

8. Goals are "broad statements describing conditions the forests will strive to achieve" although there are "no specific time frames for achieving them." (2004 LRMP at 1–1.) In the 2004 plan, one of the goals is to "ensure healthy and sustainable ecosystems for endangered, threatened and sensitive species." (*Id.* at 1–2.)

9. Objectives are "time-specific statements of planned results or outcomes responding to established goals." (2004 LRMP at 1–1.) In the 2004 plan, one of the objectives is to "implement established recovery or conservation strategies" under the Endangered Species Act. (*Id.* at 1–2.)

10. A standard is a "course of action that must be followed, or a level of attainment that must be reached to achieve forest goals." (2004 LRMP at 2–1.) For example, one of the standards in the 2004 forest plan is to "[p]rotect hydrologic function and maintain natural hydrological regimes." (*Id.* at 2–3.)

11. A guideline is also a "course of action that must be followed. However, [g]uidelines relate to activities where site-specific factors may require some flexibility." (2004 LRMP at 2–1.) An example of a 2004 plan guideline is to "[e]nsure revegetation of log landings after project activities are completed, either through artificial means or natural revegetation." (*Id.* at 2–2.)

■ Therefore, I must address whether NFMA authorized the Forest Service to analyze the Northwest Howell project under the 1986 forest plan while revising that plan. Plaintiffs argue that § 1604(f)(5)(A), which requires a forest plan to "be revised . . . from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years," suggests a negative answer. However, such provision does not prohibit the Forest Service from relying on a plan that it is revising because fifteen years have expired or because conditions have significantly changed. Section 1604(f)(5)(A) does not require the agency to cease forest management activities, including analyzing proposed timber sales while it is formulating a new forest plan. Moreover, other sections of NFMA, 16 U.S.C. §§ 1604(c) and 1604(i), reflect congressional intent to permit the Forest Service to manage a forest while it is revising its forest plan. Section 1604(c) provides that "[u]ntil such time as a unit of the National Forest System is managed under plans developed in accordance with this Act, the management of such unit may continue under existing land and resource management plans." 16 U.S.C. § 1604(c); *see also Biodiversity Assocs.*, 226 F.Supp.2d at 1302 (noting that "[w]hile 1604(c) was directed at governing the state of affairs at the time NFMA was enacted, it is evidence that Congress never intended that the statute and its provisions should have the effect of ceasing all operations in a National Forest when a plan was not . . . timely revised").

Further, § 1604(i) provides that:

Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans. . . . When land management plans are revised, resource plans and permit contracts, and other instruments, when necessary, shall be revised as soon as practicable. Any re-

vision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.

16 U.S.C. § 1604(i). Thus, when the agency revises a forest plan, it must also revise resource plans and other instruments, including plans for timber sales, that it approved under the old plan. Therefore, "Congress recognized that things should continue to progress while a plan is in the process of revision, and that planning is an ongoing process, where the circumstances continue to change" and that plans and documents that rely on a forest plan "shall continually be in flux as well." *Biodiversity Assocs.*, 226 F.Supp.2d at 1302–03 (stating that "Congress did not intend that missed statutory deadlines within NFMA would halt all action on the National Forests"); *see* Pub.L. No. 108–108, § 320; 117 Stat. 1241 (2003) (providing where the agency violates § 1604(f)(5)(A), a court should order it to revise the forest plan rather than enjoin ongoing management of a forest); *see also Sierra Club v. Bosworth*, 352 F.Supp.2d 909, 921 (D.Minn. 2005) (noting support for the proposition that a forest plan remains in effect until the effective date of its revision). Plaintiffs point out that the *Biodiversity Associates* court focused only on "the remedy for failure to revise the Plan within fifteen years," 226 F.Supp.2d at 1301, whereas in the present case conditions in the forest had significantly changed. However, no section of NFMA suggests that there should be a different remedy for failing to revise a plan within fifteen years and failing to revise a plan because of changed conditions.

Thus, the Forest Service did not violate NFMA by analyzing the Northwest Howell project under the 1986 plan and updating the analysis under the 2004 plan.

## B. Failure to Collect Population Data for Management Indicator Species

When the parties filed their briefs, regulations implementing NFMA required that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area," 36 C.F.R. § 219.19 (1999), and that to satisfy this requirement, the agency had to select and monitor certain species known as management indicator species ("MIS"). 36 C.F.R. § 219.19(a)(1) (1999). Species were selected as MIS "because their population changes [were] believed to indicate the effects" of proposed actions on other species. *Id.; see also Utah Envtl. Cong.,* 372 F.3d at 1224 (noting that MIS serve as a "proxy for determining the effects of management activities on other species"). MIS allow the Forest Service "to thoroughly evaluate the effects of the [forest management] alternatives on fish and wildlife populations ... without having to evaluate each species individually." *Utah Envtl. Cong.,* 372 F.3d at 1224 (citing *Inland Empire Pub. Lands Council v. U.S. Forest Serv.,* 88 F.3d 754, 762 (9th Cir. 1996)). After selecting MIS, the agency evaluated how proposed actions would affect them "in terms of both amount and quality of habitat and of animal population trends." 36 C.F.R. § 219.19(a)(2) (1999). In the present case, the agency chose the barred owl and pileated woodpecker to serve as MIS for red-shouldered hawk, goshawk, and marten.

Consistent with the above regulations, the 1986 forest plan required the agency to engage in various monitoring of populations of MIS including monitoring: (1) the "[p]opulation trends expected from changes in availability of suitable habitat;" (2) the "[p]opulation trends based upon State or USF & WS harvest, hunter or trapper data;" and (3) the "[p]replanned, standardized field surveys and counts of animals or their sign by USFS, State, USFWS and others." (R. 4188 at 165–66.) Plaintiffs contend that the agency failed to properly carry out its monitoring duties. The agency disputes plaintiffs' assertion on several grounds. First, it argues that in January 2005, it promulgated new regulations which replace *in toto* the regulations in effect when the parties filed their briefs, 70 Fed.Reg. 1023 (Jan. 5, 2005), and that it fully complied with the new regulations. Second, it contends that plaintiffs failed to exhaust administrative remedies on their claim that the Forest Service failed to properly monitor the population of MIS. I address only the Forest Service's exhaustion claim as I conclude it is dispositive.

 The APA requires plaintiffs to exhaust available administrative remedies before bringing their grievances to federal court. 5 U.S.C. § 704 (setting forth the APA's exhaustion requirement); *see also* 7 U.S.C. § 6912(e) (requiring that plaintiffs "exhaust all administrative appeal procedures" before bringing an action against the Department of Agriculture); 36 C.F.R. Part 215 (establishing appeal procedures in cases involving Forest Service and requiring exhaustion prior to judicial review); *Darby v. Cisneros,* 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) (holding that under the APA, exhaustion is a prerequisite to judicial review "when expressly required by statute or when an agency rule requires appeal before review" so long as the administrative action is made "inoperative pending that review"). The doctrine of exhaustion "cuts down on the work of the courts, preserves the integrity and autonomy of the administrative process, and ensures that when the administrative proceeding does come before the court, the court will have before it that mature, considered, and final articulation of the basis of the agency's action." *Glisson v. U.S. Forest Serv.,* 55 F.3d 1325,

1327 (7th Cir.1995) (citing *McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992)). In order to exhaust a claim, the claim "must be raised with sufficient clarity to allow the decision-maker to understand and rule on the issue raised." *Idaho Sporting Congress, Inc.,* 305 F.3d at 965 (citing *Native Ecosystems Council,* 304 F.3d at 900); *see also Kleissler v. U.S. Forest Serv.,* 183 F.3d 196, 202 (3d Cir.1999) (holding that to exhaust a claim, "the claims raised at the administrative appeal must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide the same claims now raised in federal court"). Under the APA, claimants may use "general terms" rather than "precise legal formulations" in raising an issue. *Idaho Sporting Congress, Inc.,* 305 F.3d at 965 (citing *Native Ecosystems Council,* 304 F.3d at 900). There is no "bright-line standard" as to when a claimant has raised a claim with sufficient clarity. *Id.* Rather, the clarity of a claim is determined on a case-by-case basis.

 The claims that plaintiffs raised in their administrative appeal are not sufficiently similar to their claim that the Forest Service failed to monitor the MIS population to enable me to conclude that the agency "was on notice of, and had an opportunity to consider and decide the same claims now raised" in this suit. *Kleissler,* 183 F.3d at 202. In their administrative appeal, plaintiffs mentioned MIS only once and then in passing; stating in the introduction to their appeal, incorrectly, that NEPA regulations required an agency to verify the viability of certain species by "in-the-field population counts of either the species or a representative species, known as a[MIS]."[12] (R. 4192.) In their appeal, plaintiffs never again mentioned, much less discussed, MIS and also

did not specifically mention the barred owl or pileated woodpecker. Moreover, although plaintiffs stated that, in their view, the agency could comply with the regulation by conducting in-the-field population counts of species or MIS, (R. 4192), the appeal indicates that they were only concerned with the Forest Service's failure to monitor the species themselves, rather than the MIS. (R. 4195) (claiming that the Forest Service must provide data on nest locations of red-shouldered hawk and goshawk); (R. 4206) (stating that the Forest Service should "address red-shouldered hawk viability in the context of site-specific analyses that use species-specific data").

Plaintiffs also argue that the allegations in their administrative appeal that the Forest Service failed to ensure the viability of the red-shouldered hawk, goshawk and marten were sufficient to raise the monitoring claim. (*See* R. 4192) (where plaintiffs alleged that timber sale endangered the survival of goshawk, red-shouldered hawk and marten); (*see also* R. 4198–4209.) However, while claims may be raised in "general terms," *Kleissler,* 183 F.3d at 202, plaintiffs' allegations relating to species viability issues were too general to alert the Forest Service to the claim that it inadequately monitored the MIS population. Plaintiffs made clear that they were concerned about the agency's alleged failures to ensure the viability of red-shouldered hawk, goshawk and marten, but none of their assertions put the agency on notice that they were claiming that it should have conducted in-the-field population counts for MIS.

Plaintiffs also contend that a section in their appeal alleging that the Forest Service lacked "site-specific data" provided the Forest Service with adequate notice of

---

**12.** As previously explained, the requirement that an agency monitor management indica-

tor species is found in NFMA regulations. *See* 36 C.F.R. § 219.19 (1999).

their MIS monitoring claim. (R. 4195.) The section states:

> Discussion and analysis impacts to neotropical migratory species in the BE and FEIS are based upon unverified computer models and generic statements. There are no site-specific data on these species, some of which are declining, in the proposed cutting units, and there are no survey data showing what numbers of sensitive species occur *in these areas* such that the agency can adequately determine that the proposal will not adversely impact the viability of these species. Unverified computer models of wildlife impacts that lack scientific support are not sufficient to understand site-specific impacts from the proposed activities. Without actual *site-specific* data showing the number of individuals of a species and how many will be killed or displaced by this proposal, the agency cannot logically conclude that the viability of these species is assured in this District.

*Id.* However, the above section relates to site-specific data for "neotropical migratory" species, i.e., birds that breed north of the Tropic of Cancer and winter in Latin America and the Caribbean. *See* United States Fish & Wildlife Service, Division of Bird Habitat Conservation, *Neotropical Migratory Bird Conservation,* at http://www.fws. gov/birdhabitat/Nmbca/eng_birdlist.htm (last viewed Mar. 31, 2005); *see also* 16 U.S.C. § 6101(1) (noting that neotropical migrants winter in Latin America and the Carribean). Neither the barred owl nor the pileated woodpecker are neotropical migratory species. Samuel D. Robbins, Jr., *Wisconsin Birdlife: Population & Distribution, Past & Present* 343, 373 (1991). Thus, the above section cannot be reasonably construed as putting the agency on notice of plaintiffs' MIS monitoring claim. Moreover, the section refers to site specific data for species themselves, rather than for MIS, and for this reason also did not raise a MIS monitoring claim.

Finally, plaintiffs point to their administrative appeal's criticism of the Forest Service's use of the Breeding Bird Survey ("BBS") to monitor various sensitive species, such as goshawk and red-shouldered hawk. (R. 4197.) Their appeal stated:

> Unfortunately, the Forest Service neither uses high quality information nor accurate scientific analysis. For example, there have been limited surveys for sensitive species in this project area and on the District as a whole. When those surveys are actually done, Forest Service limits them to only the highest quality habitats, despite the fact that the agency repeatedly insists that sensitive species such as northern goshawk are found in habitats not normally considered as high quality. Forest Service also relies upon the Breeding Bird Survey (BBS) to estimate populations of several sensitive species on the CNNF and in the project area, despite criticism of the use of the BBS for such site-specific purposes in the scientific literature. BBS can only provide limited information on the status and trends of sensitive species and cannot take the place of on-site surveys in all proposed cutting units (and adjacent forest stands that would be affected by logging and road construction/reconstruction activities).

(R. 4197.) However, the above section shows that plaintiffs' objection to the BBS was that it was not "high quality and accurate scientific information" and thus the Forest Service violated 40 C.F.R. § 1500.1(b) by relying on it. *Id.;* 40 C.F.R. § 1500.1(b) (requiring that environmental information in an EIS be of "high quality"). Moreover, to the extent that the section suggests that plaintiffs' concern was the absence of site-specific monitoring,

plaintiffs limited the claim to species themselves and did not include MIS. Thus, the section also failed to raise the MIS monitoring claim.

For the foregoing reasons, plaintiffs did not raise the MIS monitoring claim "with sufficient clarity" to allow the Forest Service "to understand and rule on the issue raised." *Idaho Sporting Congress, Inc.,* 305 F.3d at 965. Thus, plaintiffs' did not exhaust such claim, and I will therefore dismiss it.

## V. ESA CLAIMS

In 1973, Congress enacted ESA because of concerns that a large number of plant and animal species were "rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation" and that other species were "so depleted in numbers" that they were "in danger of or threatened with extinction." 16 U.S.C. § 1531(a). ESA attempts to remedy these problems by providing "a program for the conservation of such endangered species and threatened species" and "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." *Id.* at § 1531(b). Section 7 of ESA requires that a federal agency "in consultation with and with the assistance of [the FWS,[13]] insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat]."[14] 16 U.S.C. § 1536(a)(2); *see also,* Tony A. Sullins, *Endangered Species Act* 59 (2001). Section 7(a)(2) contains both procedural and substantive mandates. Procedurally,

"agencies must engage in appropriate 'consultation' with the FWS." Sullins, *supra,* at 60. Substantively, "agencies must avoid jeopardizing listed species or destroying ... their critical habitat." *Id.*

In order to protect endangered species, agencies must first determine which endangered species or critical habitat, if any, are present within the areas affected by a proposed action. *Id.* at 72. If such species or habitat are present, the agency must determine whether its proposed action "may affect" the listed species or critical habitat. 50 C.F.R. § 402.14(a) (requiring agencies to review their actions at the "earliest possible time to determine whether any action may affect listed species or critical habitat"). A proposed action "may affect" a listed species when the action "may pose *any* effects on listed species or designated critical habitat." United States Fish & Wildlife Service and National Marine Fisheries Service, *Endangered Species Consultation Handbook* xvi (1998) *at* http://endangered. fws.gov/consultations/s7hndbk/s 7hndbk.htm (last viewed Mar. 31, 2005) ("Consultation Handbook"). If the agency determines that the proposed action will not affect listed species or critical habitat, it need not consult with the FWS. *See Newton County Wildlife Ass'n v. Rogers,* 141 F.3d 803, 810 (8th Cir.1998) (noting that "[a] finding of no effect obviates the need for consultation"). However, "an agency may voluntarily request written concurrence with the 'no effect' determination" which "can be 'useful for the Administrative record' should the agency's determination be challenged." Sullins, *supra,* at 74 (citing *Consultation Handbook,* at 3–12). If, however, an agency determines that a proposed action may

---

13. Consultation is required with either the National Marine Fisheries Service or the FWS depending upon the species at issue.

14. Critical habitat includes the area occupied by the species and also other areas "outside the geographical area occupied by the species ... essential for the conservation of the species." 16 U.S.C. § 1532(5)(A).

affect a listed species or critical habitat, "the agency must determine whether the proposed action is likely to adversely affect a listed species or a designated critical habitat." *Id.* If so, a formal consultation is required. *Id.* at 76; 50 C.F.R. § 402.14. However, the agency and the FWS need not formally consult if they concur in a specific finding that the action is not likely to adversely affect the listed species. 50 C.F.R. § 402.14(b).

Formal consultation commences when the agency submits to the FWS "[a] written request to initiate formal consultation." 50 C.F.R. § 402.14(c). Such request must include descriptions of the action, the area affected, the listed species or critical habitat that may be affected, the manner in which the action may affect the listed species, and other relevant information including environmental reports. *Id.* The FWS then reviews the information and formulates a biological opinion ("BO"), 50 C.F.R. § 402.14(g), as to whether the action will likely jeopardize the continued existence of a listed species or result in the adverse modification of critical habitat. If the FWS determines that the proposed action will not jeopardize a species or adversely modify critical habitat, the agency may proceed with the action. If the FWS concludes that the proposed action will jeopardize a species or adversely modify critical habitat, but that "reasonable and prudent alternatives" to the proposed action are available, it may proceed with the proposed action by utilizing one of the reasonable and prudent alternatives. *See* 50 C.F.R. § 402.14(h) (requiring that any BO finding jeopardy or destruction of critical habitat must include "reasonable and prudent alternatives" to the proposed action). Finally, if the FWS concludes that the proposed action will jeopardize a species or adversely modify critical habitat, and that "reasonable and prudent alternatives" to the proposed action are not available, it may not proceed with the proposed action unless it obtains an exemption under ESA.

■ In the present case, the Forest Service concluded that the Northwest Howell project would have no effect on Canada lynx [15] and thus did not engage in formal consultation with the FWS. (R. 1239.) Plaintiffs allege that the no effect determination was arbitrary and capricious and that the Forest Service and the FWS should have formally consulted. The Biological Assessment ("BA") [16] concludes that the project will have no effect on Canada lynx because "no Canada lynx or appropriate habitats are present on Forest Service lands" in the project area. (R. 1240.) Considerable evidence supports the agency's conclusion. Several scientific studies indicate that neither lynx nor lynx habitat are present in the CNNF. (R. 1239) (listing studies). The agency's 2000 study entitled "Canada Lynx Conservation Assessment and Strategy" concludes that "[i]ndividual [lynx] are irregularly recorded in Wisconsin" and notes that "the

---

**15.** Lynx are short-tailed, long-legged wildcats and are similar in appearance to bobcats. Lynx primarily feed on snowshoe hares and other small mammals. In 2000, the FWS classified all lynx living south of Canada as "threatened species" under the ESA. Wisconsin Department of Natural Resources, *Canada Lynx (Lynx canadensis), at* http://www.dnr.state.wi.us/org/land/er/factsheets /mammals/lynx.htm (last modified Oct. 19, 2004).

**16.** The purpose of a biological assessment is to "review all USDA Forest Service planned, funded, and executed, or permitted programs and activities for possible effects on endangered, threatened, proposed or sensitive species." (R. 1232.) The information in a biological assessment is based on district and forest wildlife records, literature review, contact with other professionals knowledgeable of species habitat requirements and personal observations. (*Id.*)

amount of lynx habitat in this region [including Wisconsin] may be insufficient to support an isolated population" of lynx. (R. 3751.) Another agency study concludes that the CNNF lacks "sufficient or adequate lynx habitat and lack[s] evidence that resident lynx populations were present or that lynx occurred persistently over time." (R. 3641.) A third study states that trapping and hunting information for northern Wisconsin disclosed no reported captures of lynx in over twenty-five years, (R. 1260, 1270–71), and no suitable lynx habitat in the CNNF. (R. 1272.) A fourth study concludes that historically lynx were "rare visitors" and not "persistent breeder[s]" in Wisconsin. (*Id.*)

The agency also considered information suggesting the presence of lynx in the Northwest Howell area. (*See* R. 1271, 3806) (noting that snow track surveys detected lynx in the project area in four of the six years between 1992 and 1998); (*see also* R. 2441) (indicating two possible lynx sightings in 2002). However, the Forest Service concluded that such evidence was weak. It noted that although lynx sightings occurred in the mid–1990's, "[s]ubsequent lynx winter track and scent post surveys conducted by the WDNR during 1999–2001 found no evidence of lynx in the area, nor at other survey sites on the Nicolet or Ottowa National Forest, which adjoins the Nicolet to the north," (R. 1239), and that the alleged lynx sightings in 2002 might have been bobcat sightings because the observers "based their determination that these animals were Canada lynx on information they obtained from a source on the Internet" and were "not certain that it was a lynx." (R. 1261.)

Plaintiffs disagree with the Forest Service's assessment of the evidence, including the significance of the presence of lynx as transient visitors in the CNNF. However, on this type of question, it is appropriate to defer to the Forest Service's exper-

tise. *See United States v. Alpine Land & Reservoir Co.,* 887 F.2d 207, 213 (9th Cir. 1989) (stating that "[d]eference to an agency's technical expertise and experience is particularly warranted with respect to question involving ... scientific matters"); *see also Brower v. Daley,* 93 F.Supp.2d 1071, 1082–83 (N.D.Cal.2000) (where there are competing opinions "[i]t is the prerogative of [the Secretary] to weigh those opinions and make a policy judgment based on the scientific data"). Plaintiffs also object to the agency's having relied on scientific surveys. Again, however, "an agency's scientific methodology is owed substantial deference." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,* 378 F.3d 1059, 1066 (9th Cir.2004). Moreover, plaintiffs do not suggest how else the agency should have determined whether lynx were present. Plaintiffs make several other objections to the Forest Service's conclusion that lynx were not present but none establish that the agency's decision was arbitrary and capricious. Based on the record, I cannot conclude that the agency's determination was arbitrary and capricious. The Forest Service considered all relevant factors and "articulated a satisfactory explanation for its actions including a 'rational connection between the facts found and the choice made.'" *Ind. Forest Alliance, Inc.,* 325 F.3d at 858.

Because plaintiffs do not demonstrate that the Forest Service's no effect determination was arbitrary and capricious, their claim that it and FWS erred by not engaging in formal consultation also fails. As previously explained, once the Forest Service rendered its no effect determination, neither it nor the FWS were obliged to formally consult. *See Southwest Ctr. for Biological Diversity,* 100 F.3d at 1447; *Pac. Rivers Council v. Thomas,* 30 F.3d 1050, 1054 n. 8 (9th Cir.1994) (noting that "if the agency determines that a particular action will have no effect on an endangered

or threatened species, the consultation requirements are not triggered").

## VI. REMEDY

 When a court finds that an agency has failed to satisfy the requirements of NEPA, it may but is not required to enjoin further action on the project under review. *Wisconsin v. Weinberger*, 745 F.2d 412, 428 (7th Cir.1984) (rejecting presumption that injunction should issue upon a violation of NEPA). "Although the goal of NEPA is to force agencies to consider the environmental consequences of major federal actions, ... that goal is not to be achieved at the expense of countervailing public interests." *Id.* at 426. Thus, "[t]raditional equity standards govern whether or not to grant injunctive relief in a NEPA case." [17] *Heartwood, Inc. v. U.S. Forest Serv.*, 73 F.Supp.2d 962, 977 (S.D.Ill.1999). Generally, courts employ a four-factor balancing test to determine whether to issue an injunction, the elements of which are: (1) "that legal remedies are inadequate;" (2) "that not granting the injunction would result in irreparable injury;" (3) "that the balance of effects on each party of granting or not granting the relief weigh in favor of the movant;" and (4) "that the injunction is in the public interest." Leslye A. Herrmann, *Injunctions for NEPA Violations: Balancing the Equities*, 59 Univ. of Chi. L.Rev. 1263, 1271 (1992) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

In cases involving environmental injury, legal remedies are usually inadequate. *See U.S. Envtl. Protection Agency v. Envtl. Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir.1990) (noting that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages"). This is so in the present case. Money damages would not compensate for the loss of goshawk, red-shouldered hawk, marten and their habitat. Moreover, environmental injury is often irreparable. *See id.* (noting that environmental injury is "often permanent or at least of long duration, i.e., irreparable"). Courts have recognized that logging such as would occur as the result of the Northwest Howell timber sale can have long-term environmental consequences and thus satisfy the irreparable injury criterion. *See Idaho Sporting Congress, Inc.*, 222 F.3d at 569 (noting that the imminent and continuing logging activities presented "evidence of environmental harm ... sufficient to tip the balance in favor of injunctive relief"); *Neighbors of Cuddy Mountain*, 137 F.3d at 1382 (stating that "[t]he old growth forests plaintiffs seek to protect would, if cut, take hundreds of years to reproduce") (citation omitted).

 However, an environmental injury must be sufficiently likely to occur for it to be considered "irreparable." If the environmental injury is sufficiently likely to occur, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Idaho Sporting Congress, Inc.*, 222 F.3d at 569 (citing *Amoco Prod. Co.*, 480 U.S. at 545, 107 S.Ct. 1396). Thus, in the present case, the question of irreparable injury depends on the likelihood of the injury occurring. It is undisputed that the Forest Service plans to harvest within or near goshawk, red-

---

17. *But see Heartwood, Inc.*, 73 F.Supp.2d at 978 (noting that the balancing test may not need to be used in NEPA cases because NEPA requirements implicate public health and when the issues in a case involve public health "injunctive relief is proper, without resort to balancing"); *see also* Sarah W. Rubenstein, *Injunctions Under NEPA after Weinberger v. Romero–Barcelo and Amoco Production Co. v. Village of Gambell*, 5 Wis. Evntl. L.J. 1 (1998) (indicating that the lower courts are not in agreement on whether to and how to apply the traditional equitable balancing test in NEPA cases).

shouldered hawk, and marten habitat and that some of this harvesting will negatively affect such habitat and the species. (*See* R. 1098) (noting that loss of marten habitat due to timber harvest may adversely affect this species). Thus, irreparable harm is sufficiently likely, especially when coupled with "the added risk to the environment that takes place when governmental decision makers make up their minds without having before them [a NEPA compliant] analysis ... of the likely effects of their decision upon the environment." *Heartwood, Inc.*, 73 F.Supp.2d at 978–79 (citing *Conservation Law Found., Inc. v. Busey,* 79 F.3d 1250, 1271–72 (1st Cir.1996)).

Further, the relative absence of harmful effects on the Forest Service weighs in favor of granting the injunction. Although it will have to expend additional time, effort and resources in order to produce a NEPA compliant EIS, the Forest Service has presented no evidence that an injunction would result in excessive delay or excessive costs resulting from delay. *See Weinberger,* 745 F.2d at 427 (implying that granting an injunction would be inappropriate because it would result in excessive delay in implementing a national defense project). Thus, the potential costs to the Forest Service in this case do not weigh heavily against an injunction.

Finally, paying "particular regard for the public consequences in employing the extraordinary remedy of injunction," I cannot conclude that the public interest weighs against issuing an injunction. *Heartwood, Inc.*, 73 F.Supp.2d at 962 (citing *Weinberger,* 745 F.2d at 425). The public has an interest in both the issuance and the denial of the injunction. Courts have recognized that "it is not even arguable that violations by federal agencies of NEPA's provisions as established by Congress harm the public as well as the environment." *Id.* at 979; *Fund for Animals, Inc. v. Espy,* 814 F.Supp. 142, 152 (D.D.C.

1993) (noting that the public has an interest in compliance with the law as expressed by Congress). Additionally, in a case such as this, where goshawk, red-shouldered hawk, and marten and their habitat may be affected, the public's use, enjoyment and the health benefits of the lands and resources affected could be irreparably harmed. *Heartwood, Inc.*, 73 F.Supp.2d at 979. In contrast, the public also has an interest in agency efficiency and "avoiding unnecessary paperwork and agency man-hours" and may also have an economic interest in the timber produced from the Northwest Howell sale. Agencies, however, "can find cost-effective methods of conducting their business and all can continue to operate" once the Forest Service issues an EIS that complies with NEPA. *Id.* at 980. Thus, the public's economic interest is not enough to prevent the issuance of the injunction. The potential irreparable injury to the public from allowing the Northwest Howell sale to proceed on the basis of an inadequate EIS is far greater than the potential harm to the public caused by issuing the injunction.

For the foregoing reasons, I will enjoin the Forest Service from implementing the Northwest Howell timber sale until it produces a NEPA compliant EIS.

## VII. ORDER

Therefore, as outlined above,

**IT IS ORDERED** that with respect to the sufficiency of the cumulative impacts analysis, plaintiffs' motion to reverse is **GRANTED**, and the Forest Service's motion to affirm is **DENIED**.

**IT IS ORDERED** that with respect to addressing opposing scientific information and analyzing the Northwest Howell project under the 1986 plan, the Forest Service's motion to affirm is **GRANTED**, and plaintiffs' motion to reverse is **DENIED**.

IT IS ORDERED that plaintiffs' claim relating to the Forest Service's failure to monitor MIS is **DISMISSED** for failure to exhaust their administrative remedies.

IT IS ORDERED that with respect to plaintiffs' claims under ESA, the Forest Service's and FWS's motion to affirm is **GRANTED,** and plaintiffs' motion to reverse is **DENIED.**

IT IS FURTHER ORDERED that plaintiffs' motion to disregard the SIR is **DENIED.**

FINALLY, IT IS ORDERED that this case is **REMANDED** to the Forest Service for proceedings consistent with this opinion and that the Northwest Howell project is **ENJOINED** until such time as the EIS complies with NEPA.